## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

————————

MARGARET S. ARMIJO,

      Plaintiff,

vs.                                           Civil No. 04-482 WJ/RLP

LUNA COMMUNITY COLLEGE,

      Defendant.

## MEMORANDUM OPINION AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Defendant Luna Community College's Motion for Summary Judgment (Doc. 76). Having reviewed the submissions of the parties and being fully advised on the relevant law, I find the motion is well taken in part and will be granted in part but will otherwise be denied for the reasons that follow.

**BACKGROUND**

Plaintiff, acting *pro se* at the time, filed her initial Complaint in this matter on May 3, 2004 (Doc. 1) alleging her current claims against several individual Defendants and the Luna Community College Board of Directors and Administrators. These Defendants moved to dismiss. Subsequent to the filing of the motion to dismiss, Plaintiff filed a motion to amend her complaint, and the proposed amended complaint named Luna Community College as the only Defendant. The Court granted the motion to amend, and dismissed all the defendants named in the original complaint. Plaintiff, still acting *pro se*, filed her First Amended Complaint on May 11, 2005 (Doc. 40). In her First Amended Complaint, Plaintiff alleged claims for discrimination and retaliation

under the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12101 et seq., and under the

Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-632.

On July 28, 2005, attorney Gilbert J. Vigil entered an appearance on behalf of Plaintiff.

Defendant filed the instant Motion for Summary Judgment in this case on January 13, 2006 (Doc.

76).  In the Pre-Trial Order filed subsequent to the Motion for Summary Judgment, Plaintiff's

claims are clarified as a discrimination claim under the ADA, a claim under the ADEA and a

retaliation claim for engaging in EEO related activity.[1]  Viewing the evidence in a light most

favorable to Plaintiff as the Court must in deciding a motion for summary judgment, the pertinent

facts may be summarized as follows.

Plaintiff was employed with Luna Community College (College), formerly the Luna

Vocational Technical Institute, beginning in 1977.  At that time she worked as the Head Librarian.

Prior administrations at the College allowed Plaintiff to work a flexible (flex) schedule.  Her flex

schedule usually involved working four full days plus two evenings a week with Friday mornings

off.  However, if meetings requiring her attendance or other administrative duties arose during

hours she was not scheduled to work, she was expected to be at work.  She originally began

working a flex schedule to meet the needs of students at the College because students requested

evening hours at the library, but the schedule also helped her with her medical condition.

According to Plaintiff, she believes she made the previous administration aware that she desired

the flex schedule both to meet institutional needs but also due to her health issues.  She also

believes she gave the prior administration information on her medical condition by discussing it at

---

[1]Defendant characterizes the retaliation claims as being brought under the ADA and/or the
ADEA.  Plaintiff characterizes it as a claim brought pursuant to Title VII.

length during a meeting with the previous President, Dr. Pino, and the previous Vice President for Academics, Dr. Arellano. During this previous administration, Dr. Pino was Plaintiff's supervisor.

Over the years of her employment, the library did not always have evening hours because the demand for them was not always present. When there was no demand for evening hours, the library would revert to a regular 8:00 a.m. to 4:30 p.m. schedule. When a demand for evening hours arose, Plaintiff would submit a memorandum to the administration requesting the library be open in the evenings and proposing a flex schedule because Plaintiff had no authority to change the hours of the library's operation without the approval of the administration. Over the course of her employment, Plaintiff submitted three to four such memoranda. During prior administrations, none of Plaintiff's requests for a flex schedule was denied.

In addition to her job as Head Librarian, Plaintiff was also the Director of the Learning Resource Center. Her job duties included supervising and evaluating employees as well as supervising and coordinating operations of the Learning Resource Center. Plaintiff was also responsible for attending meetings with other directors and persons with supervisory positions at the College. These duties were a constant throughout her years of employment.

In 2000, Leroy Sanchez became President of the College. In October 2001, Plaintiff had a blackout. At the time of her blackout, Plaintiff was already working a flex schedule. Plaintiff requested a meeting with the administration to discuss her medical problems. At the meeting, Plaintiff requested a continued flex schedule because she was going to need some time off for medical care and because she was going to need time off in the mornings due to heavy doses of medication she was taking. Dr. Gilbert Sena, Academic Dean with the new administration, was

present at the meeting and told Plaintiff she would get whatever she needed.  Plaintiff agreed to submit a leave form whenever she needed to be out for medical reasons.

In January 2002, Dr. Mel Olivares submitted a letter to Defendant indicating that Plaintiff was ill and undergoing medical testing which required she be excused from work for two weeks in January 2002.  Dr. Olivares did not indicate at that time that Plaintiff needed a flex schedule and did not identify Plaintiff's medical condition.

On June 20, 2002, Rita Garcia, Human Resources Director, sent a letter to Plaintiff indicating that Plaintiff had adjusted her work schedule without proper approval and had not submitted proper medical documentation of a medical condition requiring an adjustment to her work schedule.  At the end of June 2002, Plaintiff submitted to Dr. Gilbert Sena a note from Dr. Olivares indicating that Plaintiff had a cardiac condition requiring medication that caused fatigue and made it difficult for Plaintiff to follow a regular work schedule.  Dr. Olivares requested that Plaintiff's needs be accommodated by allowing her to work a flexible schedule.  The letter does not specify or describe a recommended flex schedule.  However, Plaintiff included a cover memo and schedule with Dr. Olivares' letter indicating her flex work schedule as Monday through Friday from 10:00 a.m. to 6:30 p.m.  Dr. Olivares testified that his knowledge of the side effects of Plaintiff's medications was based on Plaintiff's self-report of these side effects.

On July 5, 2002, a letter signed by Dr. Sena and Ms. Garcia was hand delivered to Plaintiff.  This letter informed Plaintiff that the documentation she had submitted in support of her adjusted work schedule did not meet the requirements of the Family Medical Leave Act or the policies and procedures of the College.  The letter further indicated that Plaintiff might be eligible for a reasonable accommodation under the ADA, but that she would need to submit "appropriate

4

certification" from her physician indicating she had a recognized disability under the ADA.  The letter stated that Plaintiff had not, at that time, satisfied the requirements of the ADA or the Family Medical Leave Act with any documentation, and her request for a flex schedule was accordingly denied.  The letter informed Plaintiff that, in light of her failure to appropriately support her request for a flex schedule, her work hours were Monday through Friday from 8:00 a.m. to 4:30 p.m.  The letter gave detailed information on the Family Medical Leave Act and the information Plaintiff would have to provide to be eligible for leave under that Act but did not provide similar information on the ADA and the information that would be required in an "appropriate certification" from her doctor.

The letter informed Plaintiff that she might be causing herself and the College to be in violation of Federal requirements under the Family Medical Leave Act.  The letter stated that Ms. Garcia was charged with the responsibility of ensuring that the College was in compliance with all employment related issues including Federal and State law.  The letter then informed Plaintiff that she was required to work with Ms. Garcia to determine any benefits and/or accommodations.

Sometime in July 2002, Dr. Olivares supplemented his earlier letter and specified that Plaintiff's flex schedule should be from 10:00 a.m. to 6:30 p.m.  In response to the July 5, 2002 letter from Dr. Sena and Ms. Garcia, Plaintiff sent a memo to Dr. Sena on July 9, 2002.  In reference to the statement in the Garcia/Sena letter that Plaintiff's work hours were from 8:00 a.m. to 4:30 p.m., Plaintiff indicated that she believed she would enjoy having evenings with her family.

Plaintiff also requested a meeting with Dr. Sena and Ms. Garcia regarding the July 5, 2002 memo.  She met with them sometime during the following week.  Dr. Sena and Ms. Garcia told

5

Plaintiff that her request for a flex schedule was denied, that the decision was final, and that there was no appeal of the decision. Despite written employment policies that indicated Plaintiff could appeal such a decision to the Board, Plaintiff was told that going to the Board would result in her termination because it would be viewed as not following the chain of command.

At some time in October 2002, Plaintiff received a verbal and written reprimand for an absence that had not yet occurred.  According to Plaintiff, Ms. Garcia had heard that Plaintiff was intending to take annual leave in conjunction with her Christmas break in order to have surgery. Ms. Garcia and Ms. Bustos met with Plaintiff and told her she was not allowed to use annual leave and her Christmas break to have surgery but had to use sick leave instead.  She then received both a verbal and written reprimand for her intention to use annual leave to have surgery.

Plaintiff was upset by the meeting and reprimand and went immediately to Dr. Michael Lopez that afternoon.  He prescribed medication for her stress and wrote a letter for Plaintiff to the College stating that Plaintiff suffered from syncope and chronic back pain.  Dr. Lopez indicated in the letter that Plaintiff's problems caused her to be frequently absent from work, and that these absences would continue into the future.  However, Dr. Lopez indicated that these absences would be short-term.  Plaintiff points out that the information from Dr. Lopez was information regarding medical problems in addition to those identified by Dr. Olivares, and the information from Dr. Lopez did not supplant or replace the information supplied by Dr. Olivares. Plaintiff's evidence indicates that the precise nature of Plaintiff's medical condition was not known at that time, and Plaintiff's various medical providers were confused by her condition.

Ms. Rita Garcia conducted a "leave analysis" indicating that Plaintiff was not reporting to work on a regular basis and was away from work or arriving late to work for two-thirds of the

6

month of July 2002.  Ms. Garcia's analysis also revealed that Plaintiff missed some work during every month examined in the analysis.  The analysis indicates that all of the time taken by Plaintiff was taken by using leave time she had earned through her employment.  There is no indication that Plaintiff had any absences without leave or any leave without pay.  Often, Plaintiff would use leave to come into work late, but would stay late and work without pay to get her work done.  Plaintiff then received a letter from Barbara Bustos, Academic Director, informing her that she was not allowed in the building after 4:30 p.m.

In November 2002, Plaintiff submitted a further request for a flex schedule based on all the medical information she had submitted to date.  This was submitted to Ms. Garcia on a Luna Community College form titled "Employee Return to Work Medical History Affidavit."  The form was signed by both Plaintiff and Dr. Olivares.  Dr. Olivares specified several medical conditions on the form and indicated that Plaintiff required a modified work schedule from 10:00 a.m. to 6:30 p.m.  According to Plaintiff, she had also submitted medical documentation indicating she had a chronic condition requiring life long treatment.

During this time frame, several staff persons working for Plaintiff requested reassignment.  The President and Academic Dean indicated that staff positions left vacant due to transfers would be filled with other personnel.  Three persons were transferred, and only one position was filled.  After Plaintiff's blackout in late 2001, Plaintiff's requisitions for materials were not honored, so she was not able to order new materials.  She was unable to get computers repaired or replaced.  In late 2001, Plaintiff's staff began telling her that they had heard she was retiring and that she had been reprimanded.

7

On March 6, 2003, Plaintiff filed a Charge of Discrimination alleging that she was discriminated against on the basis of her age and alleged disability from December 2, 2001 through December 2, 2002.  The EEOC forwarded a "Right to Sue" letter to Plaintiff on November 5, 2003.  This letter was mailed to Plaintiff's home address, and Plaintiff admits that she probably received the letter within a week of November 5, 2003.  The letter informed Plaintiff that she could proceed with a lawsuit on her ADEA claim if she filed suit within 90 days.  As previously noted, Plaintiff filed her initial Complaint in this matter on May 3, 2004.

Plaintiff contends that she engaged in EEO related activities and other protected activities. The other protected activities included a statement regarding her support of the prior administration at the College and a statement to a newspaper in which she said that "Luna is going through very hard times; therefore, this is a good time to join a union."  Plaintiff concedes that her retaliation claim does arise from her age or from her disability.

Plaintiff retired from the College in June 2003.  She contends that she was forced to leave because of the College's refusal to accommodate her by allowing her a flex schedule and because of the problems with staffing, supplies, repairs, and replacement of items.  Plaintiff felt that she had to quit before her health regressed completely.

Plaintiff indicates that her medical condition or disability includes not only her cardiac condition, chronic back pain, and the side effects of her medications, but also long-term depression.  She had difficulty functioning in the morning because the medications made her groggy.  Plaintiff was usually able to begin functioning normally between 9:00 a.m. and 10:30 a.m.  Sometimes she was able to function earlier when she had slept better than normal.  During her employment when the side effects of her medication were an issue, she was taking her

8

medications between 8:00 p.m. and 9:00 p.m.  Following dinner, Plaintiff would retire to bed around 10:30 p.m. to 11:00 p.m.  Plaintiff spoke with her doctors about the side effects of her medications.  They told her there was no way around the side effects.  Plaintiff contends that her medical conditions limited her ability to work, her ability to drive, made it difficult to perform manual tasks, made it difficult to speak and write, and impacted her memory.  Plaintiff believes that a flex schedule would have been a reasonable accommodation.  She contends she did not need leave under the Family Medical Leave Act but only needed a reasonable accommodation.

On February 13, 2004, Plaintiff suffered from a severe blackout.  Plaintiff's doctors do not know the cause of the blackout and are still trying to find a diagnosis.  Plaintiff's doctors told her she would be able to return to work if she went a year without a relapse or a blackout.  In this case, Plaintiff seeks to recover lost wages and retirement benefits until an anticipated retirement date in 2007.

Defendant points out that Plaintiff would not be present at the library or the Learning Resource Center between 8:00 a.m. and 10:00 a.m. if she were allowed to work a flex schedule. Defendant notes that nobody else within the library was responsible for Plaintiff's duties of overall supervision and coordination and these duties were thus not covered during Plaintiff's absence. Plaintiff notes that the library hours when she was requesting a flex schedule were from 8:00 a.m. to 9:00 p.m., and whether she worked her regular schedule or her flex schedule, there were hours of operation when she was not present.  Plaintiff points out that her job did not require she be present during all hours of operation, her job sometimes required travel which left the operations of the library and Learning Resource Center in other hands, and she, like other employees, earned

9

leave time and was permitted to take time off.  According to Plaintiff, all of her staff were cross trained and could handle multiple responsibilities.

In its motion for summary judgment, Defendant argues it is entitled to summary judgment on Plaintiff's ADA claims because Plaintiff is not a qualified individual with a disability under the ADA, because Plaintiff did not participate in the interactive process required under ADA regulations, because Plaintiff is unable to perform the essential functions of her job with or without accommodation, and because the accommodation requested by Plaintiff would have imposed an undue hardship on Defendant.  Defendant contends it is entitled to summary judgment on Plaintiff's ADEA claim because it is time barred.  Defendant urges it is entitled to summary judgment on Plaintiff's retaliation claims because she did not engage in protected activity and because she did not suffer an adverse employment action.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242,

248-49 (1986).  In ruling on a motion for summary judgment, a Court does not weigh the

evidence, but determines whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998) (abrogated on other grounds by

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and

Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).  In

making this determination, the Court must construe all the facts in the record and reasonable

inferences that can be drawn from those facts in a light most favorable to the nonmoving party.

Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228.

**DISCUSSION**

I.      PLAINTIFF'S CLAIM OF DISCRIMINATION UNDER THE AGE
        DISCRIMINATION IN EMPLOYMENT ACT (ADEA) AND PLAINTIFF'S
        RETALIATION CLAIM

        Defendant urges that Plaintiff's ADEA claim is time barred.  Defendant contends that

Plaintiff's retaliation claim must fail because she did not engage in protected activity, did not

suffer an adverse employment action, and there is no causal connection between any protected

activity and an adverse employment action.  In her Response, Plaintiff concedes to the dismissal of

her claim under the ADEA and her retaliation claim.  Accordingly, these claims will be dismissed.

II.     CONSTRUCTIVE DISCHARGE

        Defendant notes that Plaintiff's First Amended Complaint did not explicitly raise

constructive discharge but did allege that Plaintiff was forced to retire.  Because Plaintiff was

acting *pro se* when she filed the First Amended Complaint, Defendant addressed this allegation in

its Motion for Summary Judgment.  However, Defendant addresses it as a separate and

independent "claim" rather than as a factual allegation supporting a claim.  Plaintiff's response, in

turn, addresses the constructive discharge allegation as if it represents a separate claim.

Constructive discharge is not an independent cause of action, such as a tort or a breach of

contract.  Such a claim is often tied to a Plaintiff's claims of age, sex, race or disability

discrimination or retaliation.  In order to prevail on discrimination or retaliation claims, a Plaintiff

must prove that she suffered an adverse employment action, and a Plaintiff may satisfy this burden

by showing that she was terminated by her employer.  See e.g., Sanchez v. Denver Public

Schools, 164 F.3d 527, 532 (10th Cir. 1998) (noting that discharge from employment is an

adverse employment action under Title VII and the ADEA).  Rather than proving actual

discharge, a plaintiff may demonstrate that she was constructively discharged. See Bolden v. PRC

Inc., 43 F.3d 545, 552 (10th Cir. 1994) ("An employee who is not formally discharged from

employment may still be constructively discharged . . .")  This Court is not aware of, and the

parties have not presented, any authority suggesting that constructive discharge is a separate

cause of action under federal law.  See Id. (noting in a Title VII race discrimination and retaliation

case that the constructive discharge must be due to race-based, intolerable working conditions);

But cf. Mackenzie v. City and County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005) (granting

summary judgment to defendants on a plaintiff's separate claim of constructive discharge without

addressing whether it is a separate, independent cause of action).  Conversely, there is an

abundance of authority that constructive discharge is not a separate cause of action but is a means

of establishing the discharge component of a prima facie case of discrimination or retaliation.  See,

e.g., Kimsey v. Akstein, 408 F.Supp.2d 1281, 1295 n.8 (N.D.Ga. 2005).  Thus, the Court will

12

analyze Plaintiff's allegation of constructive discharge as an alleged adverse employment action going to her only remaining claim -- a claim of discrimination under the ADA.

      An employee who is not formally discharged may still have been constructively discharged if the employee was forced to quit due to intolerable working conditions.  Bolden v. PRC, Inc., 43 F.3d 545, 552 (10th Cir. 1994).  In determining whether a plaintiff voluntarily resigned or was constructively discharged, the Court must consider the totality of the circumstances under an objective standard.  Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997).  "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  Sanchez, 164 F.3d at 534.  "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."  Jeffries, 147 F.3d at 1233; Parker v. Bd. of Regents of Tulsa Junior College, 981 F.2d 1159 (10th Cir. 1992).  "Essentially, a plaintiff must show that she had no other choice but to quit."  Sanchez, 164 F.3d at 534.  The standard for constructive discharge is objective.  Therefore, the issue is whether a reasonable person in Plaintiff's position would have viewed the working conditions as intolerable.  Jeffries, 147 F.3d at 1233; Derr v. Gulf Oil Corporation, 796 F.2d 340, 343 (10th Cir. 1986).  The Plaintiff's subjective views of the working conditions are irrelevant.  Sanchez, 164 F.3d at 534.

      Viewing the evidence in a light most favorable to Plaintiff shows she was working a flex schedule at the College until she requested that she be able to continue the flex schedule due to a medical condition in October 2001.  After making this request, Rita Garcia, Human Resources Director, informed Plaintiff that Plaintiff had changed her own schedule without proper

authorization and without providing sufficient documentation to support any claim of disability. Ms. Garcia and Dr. Sena then informed Plaintiff in July 2002 that her request for a flex schedule was denied, that the decision was final and that she would be fired if she attempted to appeal this decision to the Board.  Plaintiff responded to this in a letter stating that she would enjoy having evenings with her family.

After October 2001, Plaintiff's requests for supplies and materials began to be denied and she was unable to get computers repaired or replaced.  Four of Plaintiff's staff were transferred out of the library, and only one of the positions was filled leaving Plaintiff understaffed.  After her request for a flex schedule was denied, Plaintiff began using sick leave to come into work late. She would often stay late without pay to get her work done.  She was then informed by Barbara Bustos, Academic Director, that she was not allowed to be in the building after her normal work hours.  In late 2001, Plaintiff's staff began telling her they had heard she had been reprimanded and that she was retiring.

Some time in October 2002, a year after Plaintiff had her initial blackout, Rita Garcia and Barbara Bustos gave Plaintiff a written and verbal reprimand for intending to use vacation time to have surgery.  In November 2002, Plaintiff made a new request for a flex schedule.  There is no indication that this request was addressed by the College.  Plaintiff retired from the College in June 2003.  Plaintiff contends she was forced to resign because her flex schedule was denied.

Even considering the totality of the circumstances, Plaintiff was not exposed to such objectively intolerable working conditions that she was forced to retire.  Though she was deprived of a fully staffed library, had difficulty getting supplies and repairs and had her request for a flex schedule denied, her working conditions were not made so difficult that a reasonable person

would have felt compelled to retire.  Plaintiff's retirement does not even appear to be related to the circumstances that Plaintiff alleges forced her to retire.  Plaintiff retired more than a year and a half after she had her October 2001 blackout and almost a year after her request for a flex schedule was denied.  Even viewing the facts in a light most favorable to Plaintiff, her retirement was voluntary and she was not constructively discharged.

III.    PLAINTIFF'S CLAIM OF DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)

The ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability."  42 U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . .."  42 U.S.C. § 12112(b)(5)(A). Discrimination also includes harassment sufficient to create a hostile work environment.  Lanman v. Johnson County, Kan., 393 F.3d 1151, 1156 (10th Cir. 2004).

To prevail on her ADA claim, a plaintiff must show that (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) her employer discriminated against her because of her disability.  Mackenzie v. City and County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005).  There is no dispute that, at all times during her employment at the College, Plaintiff was qualified, with or without reasonable accommodation, to perform the essential functions of

her job.[2]  What is disputed in this case is whether Plaintiff is a qualified person with a disability

under the ADA and whether Defendant discriminated against her on the basis of such disability.

      A.    <u>Is Plaintiff a Person with a Disability Under the ADA?</u>

To meet the first prong of the prima facie case, Plaintiff must first show that she is a

person with a disability under the ADA.  The ADA defines a disability as either (1) a physical or

mental impairment that substantially limits one or more of an individual's major life activities; (2)

a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. §

12102(2).  Plaintiff's pleadings appear to allege that she is regarded as disabled and that she has a

physical impairment that substantially limits several major life activities.

      1.    <u>Is Plaintiff Regarded as Disabled?</u>

Plaintiff's pleadings make vague reference to being regarded as disabled thus appearing to

allege that Plaintiff meets the third criteria for being a person with a disability under the ADA.  A

person is regarded as disabled when (1) a covered entity mistakenly believes that a person has a

physical impairment that substantially limits one or more major life activities, or (2) a covered

entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more

major life activities.  <u>Lanman v. Johnson</u>, 393 F.3d 1151, 1156 (10th Cir. 2004).  Plaintiff presents

no evidence or argument that she was mistakenly believed to have a physical impairment or was

mistakenly believed to be substantially limited in any major life activity.  Accordingly, she is not

regarded as disabled.

---

    [2]Defendant argues that Plaintiff is no longer qualified with or without accommodation
because a blackout in February 2004 after Plaintiff retired rendered Plaintiff incapable of working.
Even if true, this goes to the issue of damages rather than whether or not the Defendant
discriminated against Plaintiff based on a disability before February 2004.

2.    <u>Does Plaintiff Have a Physical or Mental Impairment that Substantially
        Limits a Major Life Activity?</u>

In determining whether a plaintiff has a physical or mental impairment that substantially

limits major life activity, a court must (1) consider whether the plaintiff's alleged disability is a

physical or mental impairment; (2) identify the life activity upon which the plaintiff relies and

determine whether it constitutes a major life activity; and (3) examine whether there is a fact issue

with regard to whether the impairment substantially limited the major life activity.  <u>Mackenzie</u>,

414 F.3d at 1275.  "Whether the plaintiff has an impairment within the meaning of the ADA is a

question of law for the court to decide.  Whether the conduct affected is a major life activity for

purposes of the Act is also a legal question for the court.  However, ascertaining whether the

impairment substantially limits [a] major life activity is a factual question for the jury."  <u>Doebele v.</u>

<u>Sprint/United Management Co.</u>, 342 F.3d 1117, 1129 (10th Cir. 2003).

A physical impairment under the ADA is "any physiological disorder or condition . . .

affecting one or more of the following body systems: . . . cardiovascular."  29 C.F.R. §

1630.2(h)(1).  The evidence shows that Plaintiff had a cardiac condition.  Thus, she has a physical

impairment under the ADA.

Major life activities include functions such as caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(i).

Plaintiff has provided evidence that she takes medications for her conditions, and the side effects

of these medications cause her to feel groggy and impaired her ability to function in the morning.

According to Plaintiff, her physical impairments limited her ability to work, made her unable to

drive, made it difficult to perform manual tasks, made it difficult to speak in conversation, made it difficult to write professional reports, and impacted her memory.

While memory is not listed as a major life activity in the regulations, the list is not exhaustive.  See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1231 (10th Cir.1999).  Learning is listed, and memory is sufficiently related to learning that I conclude that memory or remembering is a major life activity.  Writing and driving are also not listed as major life activities in the regulation but are qualitatively different from those listed.  The listed activities are either activities persons of average capability do nearly instinctively at birth such as breathing or are basic skills that persons of average capability learn automatically through exposure and experience such as speaking.  Writing is a learned skill that some persons of average capability do not acquire.  While persons who cannot write may have greater difficulties in life than persons who can, I conclude that writing is not a major life activity under the ADA regulations.  Driving is similarly a learned skill that many people of average capability do not acquire.  In most states, driving is a privilege that requires a license and can be revoked.  I conclude that driving is not a major life activity under the ADA regulations.  See, e.g., Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329 (11th Cir. 2001) (driving is not a major life activity).  Working, performing manual tasks and speaking are major life activities under the ADA regulations.

A person is substantially limited in a major life activity if she is (1) unable to perform a major life activity that the average person in the general population can perform; or (2) if she is significantly restricted as to the condition, manner or duration under which she can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. §

1630.2(j).  As noted, whether a person is substantially limited in a major life activity is an issue of fact.  Therefore, summary judgment on this basis is not appropriate unless no reasonable jury could find that Plaintiff's impairment substantially limited her major life activities.

Plaintiff's evidence does not indicate that she is completely unable to perform any of the identified major life activities.  Thus, Plaintiff's evidence must be such that a reasonable jury could conclude that Plaintiff is significantly restricted as to the condition, manner or duration under which she can perform the identified major life activities.

By Plaintiff's affidavit testimony, she has difficulty doing manual tasks and can no longer do yard work and gardening.  Plaintiff gives no further information on the extent of the limitations on her ability to do manual tasks.  I conclude that no reasonable jury could find, based on this evidence, that Plaintiff is substantially limited in her ability to do manual tasks.

With regard to speaking, Plaintiff states that she tires easily and has trouble with mental focus and has trouble speaking in conversation.  She gives no further information on the limitations on her speech.  I conclude that no reasonable jury could find that Plaintiff is substantially limited in her ability to speak.

Plaintiff's affidavit testimony indicates that her difficulty with mental focus also affects her memory.  She does not describe her memory deficits or give any detail on the effect her impairment has on her memory.  I conclude that no reasonable jury could find that Plaintiff is substantially limited in her ability to remember.

Plaintiff's evidence shows she had substantial difficulty working before 10:00 a.m. and had to use substantial amounts of sick leave during the morning hours in order to continue working.  I conclude that a reasonable jury could find that Plaintiff's difficulty working before 10:00 a.m. is a

substantial limitation on the activity of working because it restricts the manner and duration under which she could work compared to the average person.  Thus, there are issues of fact with regard to whether Plaintiff is a person with a disability under the ADA.

      B.      <u>Assuming Plaintiff is a Person with a Disability under the ADA, Is There Evidence That Defendant Discriminated Against Plaintiff Because of Her Disability?</u>

Plaintiff alleges two types of discrimination - hostile work environment discrimination and failure to make a reasonable accommodation.  The claim for hostile work environment discrimination is analyzed using the McDonnell Douglas framework.  However, the claim that Defendants failed to make a reasonable accommodation is analyzed differently.  <u>Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I</u>, 264 F.3d 999, 1006 n.9 (10th Cir. 2001) (McDonnell Douglas burden shifting does not apply disability discrimination claims based on failure to accommodate).

      1.      <u>Is Defendant Entitled to Summary Judgment on Plaintiff's Claim that it Discriminated Against Plaintiff on the Basis of Disability by Creating a Hostile Work Environment?</u>

Under the McDonnell Douglas framework, (1) a plaintiff bears the initial burden of establishing a prima facie case of discrimination; (2) the burden then shifts to the defendant to offer a legitimate, nondiscriminatory reason for it employment decision; and (3) the burden shifts back to the plaintiff to show a genuine issue of fact as to whether the defendant's proffered reason is a pretext for discrimination.  <u>See</u> <u>Mackenzie</u>, 414 F.3d at 1274 (applying the McDonnell Douglas framework in an ADA case).  The only part of the prima facie case at issue is whether there is evidence of discrimination.

Hostile work environment harassment occurs "where conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive working environment." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986). For harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986).  The harassing conduct must be "both objectively and subjectively abusive." Turnbull v. Topeka State Hospital, 255 F.3d 1238, 1243 (10th Cir. 2001). There is no "mathematically precise test" for determining whether conduct is sufficiently severe or pervasive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).  Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.  The existence of  harassment must be determined "in light of the record as a whole." Meritor, 477 U.S. at 69 (quoting 29 C.F.R. § 1604.11(b) (1985)) (internal quotation marks omitted).  Thus, this Court must examine the totality of the circumstances in reviewing the summary judgment motion with regard to Plaintiff's hostile environment claims. See Davis v. U.S. Postal Svc.,142 F.3d 1334, 1341 (10th Cir. 1998). For a hostile environment claim to survive summary judgment, an employee must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  O'Shea v. Yellow Tech. Serv., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999) (quotations and citations omitted).

Additionally, the conduct considered by the Court must be discriminatory conduct in that it is harassment because of Plaintiff's disability.  No matter how unpleasant Plaintiff's work environment became, if the unpleasantness in not due to her disability, she has not been the victim of disability discrimination based on that environment.  Cf. Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir.1994) (For Title VII sexual harassment claim, "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."); see also Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)) (Title VII forbids harassment actions taken on the **basis of sex**) (emphasis added); Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408, 1412 (10th Cir. 1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)) (Title VII hostile work environment harassment requires unwelcome **sexual** conduct) (emphasis added).

In addition to her allegations regarding Defendant's refusal to allow her to work a flex schedule, Plaintiff alleges that she was not permitted to work late, that her requests for materials were not honored, and she was unable to get computers replaced or repaired.  Additionally, of four staff positions that became vacant after October 2001, only one was filled.  Finally, her staff were apparently hearing rumors that Plaintiff had been reprimanded and would be retiring.

The record does not indicate the period of time over which these event occurred other than to state that they began after October 2001.  Nor is there any indication of how many times a request for materials, computer repairs or computer replacement was denied.  Thus, there is no evidence that these events occurred with any great frequency or was in any way pervasive enough to create a hostile work environment.

These events, even in their totality, were not sufficiently severe to create a hostile work environment.  These events were not threatening, humiliating or offensive.  The conduct did not permeate Plaintiff's workplace with discriminatory intimidation, ridicule, and insult.  While Plaintiff's difficulty obtaining materials, the reduction in her staff, and her inability to repair or replace computers likely interfered with her ability to perform her work, there is an absence of evidence that these events had any connection to Plaintiff's disability.  Thus, Plaintiff has failed to make a prima facie showing of hostile work environment disability discrimination in violation of the ADA.

    2.    <u>Are There Disputed Issues of Material Fact as to Whether Defendant Discriminated Against Plaintiff on the Basis of Disability by Refusing to Provide a Reasonable Accommodation?</u>

The ADA requires an employer to make reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5)(A).  The federal regulations implementing the ADA envision an interactive process that requires participation by both parties.  <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1171 (10th Cir. 1999).

Plaintiff's claim rests on her allegation that she requested a reasonable accommodation when she requested a flex schedule.  Defendant contends that Plaintiff's claim of discrimination based on failure to provide reasonable accommodation fails because Plaintiff did not participate in the "interactive process" contemplated under the ADA and because Plaintiff's requested accommodation would have imposed an undue hardship on Defendant.

The interactive process referred to by Defendant is an informal process to determine the appropriate reasonable accommodation for an employee.  29 C.F.R. § 1630.2(o)(3).  Generally, the employee is responsible for initiating the interactive process by providing notice to the employer of the his or her disability, any resulting limitations, and a desire to remain employed.  Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999).  In order to initiate the process, it is enough for a plaintiff to notify the employer of the nature of her disability and specifically request information about possible accommodation.  Woodman v. Runyon, 132 F.3d 1330, 1345 (10th Cir. 1997).  An employee need not use magic words to initiate the interactive process and request a reasonable accommodation.  Davoll v. Webb, 194 F.3d 1116, 1132 n.8 (10th Cir. 1999) (citing  Smith, 180 F.3d at 1172).  Once an employee initiates the process, it becomes the employer's burden to assist the employee in identifying a reasonable accommodation.  Woodman, 132 F.3d at 1345.   Both parties have an obligation to interact in good faith to determine how to reasonably accommodate the employee. Davoll, 194 F.3d at 1132 n.8.

In this case, Plaintiff met with the administration in late 2001, informed them of her medical condition and requested she be able to continue to work the flex schedule she was already working.  At the end of June 2002, Plaintiff submitted a note from her doctor that she had a cardiac condition requiring medication that caused fatigue and made it difficult for her to follow a regular work schedule.  Defendant requested further information, and Plaintiff made attempts to provide that information.

Plaintiff's conduct was sufficient to initiate the interactive process.  A reasonable jury could find that Plaintiff made a good faith effort to participate in an interactive process with

Defendant.  Accordingly, Defendant's argument that it is entitled to summary judgment because

Plaintiff failed as a matter of law to participate in the interactive process is without merit.

"The employer ... bears the burden of persuasion on whether a proposed accommodation

would impose an undue hardship."  Colorado Cross Disability Coalition v. Hermanson Family

Ltd. Partnership I, 264 F.3d 999, 1006 (10th Cir. 2001); Rascon v. U.S. West Communications,

Inc., 143 F.3d 1324, 1334 (10th Cir.1998) (quoting Smith v. Ameritech, 129 F.3d 857, 866 (6th

Cir.1997)).  To meet this burden, an employer may not merely speculate that a suggested

accommodation is not feasible.  Woodman, 132 F.3d at 1345.  "When accommodation is required

to enable the employee to perform the essential functions of the job, the employer has a duty to

gather sufficient information from the applicant and qualified experts as needed to determine what

accommodations are necessary to enable the applicant to perform the job...."  Id. (citing

Buckingham v. United States, 998 F.2d 735, 740 (9th Cir.1993)).  The ADA definition of

"reasonable accommodation" lists the kinds of reasonable accommodations that may be required

of an employer and includes the modification of work schedules.  42 U.S.C. § 12111(9)(B).  The

ADA definition of "undue hardship" is

> an action requiring significant difficulty or expense, when considered in light of . . .
> (i) the nature and cost of the accommodation . . . (ii) the overall financial resources
> of the facility . . . involved in the provision of the reasonable accommodation; the
> number of persons employed at such facility; the effect on expenses and resources,
> or the impact otherwise of such accommodation upon the operation of the facility;
> (iii) the overall financial resources of the covered entity . . . ; and (iv) the type of
> operation or operations of the covered entity, including the composition, structure,
> and functions of the workforce of such entity; the geographic separateness,
> administrative, or fiscal relationship of the facility or facilities in question to the
> covered entity.

42 U.S.C. § 12111(10).

25

Defendant contends that the accommodation requested by Plaintiff would have imposed an undue hardship on the College because Plaintiff needed to be physically present in the Learning Resource Center from 8:00 a.m. to 4:30 p.m. to provide supervision and evaluation of employees as well as to ensure the proper operation of the library.  Plaintiff's evidence shows that the flex schedule she requested as a reasonable accommodation had been approved during previous administrations and that Plaintiff was working a flex schedule at the time she requested a reasonable accommodation with her request being merely that the schedule continue.  The evidence also shows that she was not required to be physically present during all the hours of the library operation when the library was open for extended hours, and Plaintiff was not physically present in the library when using earned leave or when her job required travel.  From this evidence, a reasonable jury could find that the requested accommodation was feasible and would not impose an undue hardship on the Defendant.  Defendant has thus failed to meet its burden of showing it is entitled to summary judgment because the requested accommodation would impose upon it an undue hardship.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Luna Community College's Motion for Summary Judgment (Doc. 76) is hereby GRANTED IN PART AND DENIED IN PART as described herein.

_____
UNITED STATES DISTRICT JUDGE